1
2
3
4
5
6
7
8 **UNITED STATES DISTRICT COURT**
9 **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
10

11 PEOPLE FOR THE ETHICAL       Case No. 2:21-cv-07662-SSS-MAAx
   TREATMENT OF ANIMALS, INC.,
12
13             Plaintiff,         **ORDER GRANTING PLAINTIFF'S
                                  MOTION FOR SUMMARY**
14       v.                       **JUDGMENT [DKT. 47]**

15 LOS ANGELES COUNTY
   METROPOLITAN
16 TRANSPORTATION AUTHORITY,
17
18             Defendant.
19
20
21
22
23
24
25
26
27
28

Before the Court is Plaintiff People for the Ethical Treatment of Animals, Inc.'s ("PETA") Motion for Summary Judgment.  [Dkt. 47].  Defendant Los Angeles County Metropolitan Transportation Authority ("Metro") opposes and seeks summary judgment in its favor.  [Dkt. 48].  The Court has reviewed the Parties' submissions and, for the reasons stated below, **GRANTS** summary judgment in favor of PETA.

## I.   BACKGROUND

This dispute arises from PETA's desire to place advertisements ("ads") on Metro's buses.  Metro sells advertising opportunities on its buses and railways.  [Dkt. 50-2 ("SUF") ¶ 4].  Ad sales on Metro's buses are managed by an out-of-home media company, Outfront Media ("Outfront").  [SUF ¶ 34].  Metro's prohibition on noncommercial ads is as follows:

> Metro does not accept advertising from non-governmental entities if the subject matter and intent of said advertising is non-commercial. Specifically, acceptable advertising must promote for sale, lease or other form of financial benefit a product, service, event or other property interest in primarily a commercial manner for primarily a commercial purpose.

[SUF ¶¶ 12–13].  Metro's policy contains two exceptions:

> **Exception 1**: Governmental Agencies, meaning public agencies specifically created by government action located in Los Angeles County or a Federal or State of California Governmental Agency, may purchase advertising space for messages that advance specific government purposes. The advertising must clearly, on the face of the advertising, identify the Governmental Agency. It is Metro's intent that government advertising will not be used for comment on issues of public debate.

> **Exception 2**: Metro will accept paid advertising from non-profit organizations that partner with a Governmental Agency (as defined in Exception 1 above) and submit advertising that advances the joint purpose of the non-profit organization and the Governmental Agency, as determined by each of them. In order for advertising to qualify under this exception, the advertising must clearly, on the face of the advertising,

identify the Governmental Agency and indicate that the Governmental Agency approves, sponsors, or otherwise authorizes the advertising. The non-profit organization must also provide a Statement of Approval (attached) from the Governmental Agency describing the joint purpose to be advanced and setting forth a statement acknowledging support and approval for the submitted advertising. Any message displayed under this exception must adhere to all other content restrictions stated in this policy.

[SUF ¶¶ 14–17]. Relevant here, Exception 2 allows noncommercial ads that are endorsed by a governmental agency. [*Id.*]. Metro itself can and has served as a sponsoring government agency for a non-profit's noncommercial ad. [SUF ¶ 18].

On July 29, 2021, PETA emailed Outfront expressing interest in running two ads on Metro buses: one ad included an image of a chicken and the statement, "I'm not popcorn chicken. I'm a living being! Go vegan," and the other ad included an image of a rodent in a laboratory beaker and the statement, "Mental Health matters. Forced Swim Tests Don't." [SUF ¶¶ 140, 154; Dkt. 47-6 at 143–44]. On August 2, 2021, Shannon Garrit, a representative from Outfront, submitted to Metro the two ads from PETA for approval. [SUF ¶ 154]. On August 5, 2021, Bernadette Mindiola, Metro's Deputy Executive Officer of Marketing [SUF ¶ 41], emailed Garrit stating that the ads would not be approved because PETA had not secured a "gov't sponsor." [SUF ¶ 155]. Mindiola's determination that PETA would require a government sponsor for these two ads was made on the basis of Metro's advertising policy's prohibition on noncommercial advertising. [SUF ¶ 157]. On August 6, 2021, Outfront informed PETA that the ads did not comply with Metro's prohibition on noncommercial advertising and PETA would have to obtain a government sponsor for the ad and place a government seal on its ad for Metro to approve it. [Dkt. 47-6 at 105]. Outfront cited "2.1.2 non-commercial advertising clause" of

1    Metro's advertising policy as the basis for why PETA would not be able to
2    place its ads on Metro without a government sponsor.  [SUF ¶ 142].

3         On December 20, 2021, PETA reached out to Outfront expressing interest
4    in placing an ad on Metro buses featuring a photograph of a sheep and the text
5    "I want you to change[.]  Wear vegan[.]  PETA[.]"  [SUF ¶ 144].  On January
6    13, 2022, Outfront sent an email to Metro stating that PETA was informed that
7    their ad would not be allowed "because it is not commercial."  [SUF ¶ 159].  On
8    January 18, 2022, Outfront informed PETA that Metro would not allow the
9    "wear vegan" ad to be placed because the ad was not "selling something or an
10   event."  [SUF ¶ 145].  On March 7, 2022, Mindiola sent an email to Outfront
11   stating that PETA's ad may be accepted if PETA obtained a government
12   sponsor and thus satisfied Exception 2.  [SUF ¶ 160].  Metro would not run
13   PETA's ad because it is a noncommercial ad that did not meet the requirements
14   of Exception 2.  [SUF ¶ 161].  Failure to obtain this government sponsor and
15   satisfy Exception 2 to the Metro's prohibition on noncommercial ads is the only
16   basis in which PETA's ad was or would be rejected.  [SUF ¶ 163].

17   **II.    LEGAL STANDARD**

18        Summary judgment is appropriate when there is no genuine issue as to
19   any material fact and the moving party is entitled to judgment as a matter of
20   law.  Fed. R. Civ. P. 56(a).  The moving party has the initial burden of
21   identifying the portions of the pleadings and record that it believes demonstrate
22   the absence of an issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S.
23   317, 323 (1986).  The moving party must show that "under the governing law,
24   there can be but one reasonable conclusion as to the verdict."  *Anderson v.*
25   *Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

26        If the moving party has sustained its burden, the non-moving party must
27   then show that there is a genuine issue of material fact that must be resolved at
28   trial.  *See Celotex*, 477 U.S. at 324.  The non-moving party must make an

affirmative showing on all matters placed at issue by the motion as to which it has the burden of proof at trial. *See id.* at 322; *Anderson*, 477 U.S. at 252. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248. "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence." *Oracle*, 627 F.3d at 387 (citing *Anderson*, 477 U.S. at 252).

When deciding a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party. *See Barlow v. Ground*, 943 F.2d 1132, 1136 (9th Cir. 1991). Thus, summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party based upon the record taken as a whole. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

### A. Standing

Metro argues PETA lacks standing to pursue its claim for violations of the First and Fourteenth Amendments because PETA has not suffered an injury in fact. Constitutional standing requires (1) an injury in fact, (2) causation, and (3) a likelihood that a favorable decision will redress the injury. *Preminger v. Peake*, 552 F.3d 757, 763 (9th Cir. 2008) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). An injury in fact is "an invasion of a legally protected interest" that is (a) "concrete and particularized" and (b) "actual or imminent," not "conjectural" or "hypothetical." *Id.* "Injury in fact" is particularized if it has affected the plaintiff in a "personal and individualized way." *Id.* Even a minimal injury may suffice to establish standing. *Id.*

Metro argues "PETA cannot credibly assert any concrete injury [because] Metro has not rejected any of PETA's proposed advertisements." [Dkt. 48 at 11]. But Metro's assertion is contrary to the undisputed facts. Metro refused to

-5-

approve PETA's "popcorn chicken" and "[m]ental health matters" ads because PETA had not secured a government sponsor . [SUF ¶¶ 140, 142, 154–55, 157]. Metro also did not allow PETA's "wear vegan" ad because it was a noncommercial ad that did not meet the requirements of Exception 2. [SUF ¶¶ 145, 160–61, 163]. Metro's statements that PETA's ads would not be approved or allowed constitute a rejection of PETA's proposed ads and are an injury in fact. PETA thus has standing.

**B.   Ripeness**

Metro also argues PETA's claim is not ripe because "there is no final action by Metro denying PETA access to Metro's advertising space." [Dkt. 48 at 12]. According to Metro, it "merely requested PETA to comply with the advertising policy requirements[.]" [*Id.*]. Ripeness prevents courts from adjudicating premature disputes, such as an abstract disagreement over administrative policies. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807 (2003).

Similar to Metro's standing argument, its ripeness argument also fails because it contradicts the undisputed facts. Metro rejected PETA's ads when it stated the ads would not be approved or allowed, [SUF ¶¶ 154–55, 158–59], and thus denied PETA access to Metro's advertising space. Metro's subsequent requests that PETA comply with Exception 2 and PETA's subsequent attempts to do so do not nullify the fact that Metro had already rejected PETA's ads.[1] PETA's claim is thus ripe for adjudication.

---

[1] Indeed, Metro does not dispute that it "rejected" four ads from APLA health when it required the advertiser to first obtain a government sponsor. [SUF ¶ 126]. Similarly, requiring PETA to first obtain a government sponsor also constitutes a rejection.

1      **C.      Type of Forum**

2          The Parties disagree on whether Metro's bus ad space is a designated

3   public forum or limited public forum, which determines the standard of review

4   the Court applies to speech restrictions therein.  In a designated public forum,

5   content-based restrictions on speech are prohibited unless they meet strict

6   scrutiny, and in a limited public forum, such restrictions are permissible as long

7   as they are reasonable and viewpoint neutral.  *Amalgamated Transit Union Loc.*

8   *1015 v. Spokane Transit Auth.*, 929 F.3d 643, 651 (9th Cir. 2019) (citation

9   omitted).

10         PETA argues Metro's bus ad space is a designated public forum.  "The

11  government creates a designated public forum when it intends to make property

12  that hasn't traditionally been open to assembly and debate 'generally available'

13  for 'expressive use by the general public or by a particular class of speakers.

14  The defining characteristic of a designated public forum is that its open to the

15  same 'indiscriminate use,' and 'almost unfettered access' that exist in a

16  traditional public forum."  *Seattle Mideast Awareness Campaign v. King Cnty.*

17  ("*SeaMAC*"), 781 F.3d 489, 496 (9th Cir. 2015) (citation omitted).  "In contrast,

18  when the government intends to grant only 'selective access,' by imposing

19  either speaker-based or subject-matter limitations, it has created a limited public

20  forum."  *Id.* at 497 (citing *Arkansas Educ. Television Comm'n v. Forbes*, 523

21  U.S. 666, 679 (1998); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,

22  473 U.S. 788, 806 (1985)).

23         While in the past, the Ninth Circuit has found that certain bus advertising

24  spaces qualified as limited public fora, *see id.* (citing *SeaMAC*, 781 F.3d 489,

25  497 (9th Cir. 2015); *Am. Freedom Def. Initiative v. King Cty.* ("*AFDI I*"),

26  796 F.3d 1165, 1168–70 (9th Cir. 2015)), it did not adopt a bright-line rule or

27  categorically hold that all bus ad space will always qualify as a limited public

28  forum.  Instead, the Ninth Circuit analyzed three factors to ascertain the

government's intent to create either a designated public forum or limited public forum with respect to bus ad space:  (1) the terms of any policy the government has adopted to govern access to the forum, (2) how the government's policy has been implemented in practice, and (3) the nature of the government property at issue.  *See SeaMAC*, 781 F.3d at 497; *see also AFDI I*, 796 F.3d at 1170 (applying *SeaMAC* factors).

Under the first *SeaMAC* factor, if the government requires speakers seeking access to first obtain permission under pre-established guidelines that impose speaker-based or subject-matter limitations, the government generally intends to create a limited, rather than a designated, public forum.  *SeaMAC*, 781 F.3d at 497.  Here, Metro requires speakers to first obtain permission pursuant to its advertising policy, i.e. the instant policy at issue, before permitting ads to be placed on its buses.  [SUF ¶¶ 7–17].  Therefore, this factor indicates Metro's intent to create a limited public forum.

Under the second *SeaMAC* factor, "[i]f the policy requires speakers to obtain permission under guidelines whose terms are routinely ignored, such that in practice permission is granted 'as a matter of course to all who seek [it],' the government may have created a designated public forum."  *Id.*  This factor is the core of PETA's argument.

PETA argues that because Metro has permitted several ads that violate its policy, Metro has created a public forum.[2]  There is evidence that Metro did

---

[2] Although PETA argues Metro has "allowed in *five and half times*" more ads that violate the noncommercial ad prohibition than it has prohibited, PETA does not cite competent evidence to support this claim.  [Dkt. 47-1 at 31].  While PETA does cite permitted ads that Metro has admitted violated its policy, which serve as the numerator of PETA's statistic, PETA does not cite evidence to show the entire body of ads that were rejected by Metro under the policy, and thus there is no established denominator for PETA's statistical representation. Moreover, even if PETA were to establish its statistic by competent evidence, a ratio of permitted and unpermitted ads is not meaningful because the ratio could be explained by reasons other than the government's intent, such as the number

apply its policy by rejecting several noncommercial ads [SUF ¶¶ 126–129].[3]  As discussed more fully below, although Metro has permitted certain noncommercial ads that violate its advertising policy [*See* SUF ¶ 46, 51–52, 54–57, 59–60, 64, 78], Metro has admitted that these violating ads were permitted by error and mistake [SUF ¶¶ 47, 53, 58, 61, 66, 80], i.e. not by intent.

Metro's inconsistent application of its policy distinguishes the instant case from *SeaMAC* and *AFDI*, wherein the Ninth Circuit found that in each of those cases the government had consistently applied its restriction to its ad space.  *See SeaMAC*, 781 F.3d at 498 ("'By consistently limiting ads it saw as in violation of its policy,'" the County 'evidenced its intent not to create a designated public forum.'"); *AFDI*, 796 F.3d at 1170 (finding bus ad space constituted limited public forum, in part, because "Metro has rejected a range of proposed ads, including other public-issue ads").

However, this case is also distinguishable from the out-of-circuit cases PETA relies on, wherein the government agency converted its ad space into public fora by accepting certain ads.  In *Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Auth.*, 767 F.2d 1225, 1233 (7th Cir. 1985), the Seventh

_____

and type of proposed ads and their susceptibility to mistaken characterization.

[3] Metro objects to SUF ¶¶ 127–29 as "unsupported by admissible evidence" based on *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 776 (9th Cir. 2002), claiming the exhibits PETA relies on are not properly authenticated.  However, "Rule 56 was amended in 2010 to eliminate the unequivocal requirement that evidence submitted at summary judgment must be authenticated."  *Romero v. Nevada Dep't of Corr.*, 673 F. App'x 641, 644 (9th Cir. 2016).  The amended Rule requires that such evidence "would be admissible in evidence" at trial.  *Id.* (citing Fed. R. Civ. P. 56(c)(4)).  The Court finds that Exhibits VV, WW, and XX to the Strugar Decl. [Dkt. 47-6 at 50–61], the bases for SUF ¶¶ 127–29, would be admissible in evidence at trial and overrules Metro's objection thereto.  The Court also overrules all of Metro's evidentiary objections to the Declaration of Matthew Strugar and/or Material Noted Therein because they are all based on Metro's improper reliance on *Orr*.  [*See* Dkt. 50-1 at 2–8].

1   Circuit found the ad space was a public forum where there was "no policy at

2   all."  That is not the case here as Metro has its advertising policy prohibiting

3   noncommercial ads that is the center of the dispute.

4           In *New York Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 130 (2d

5   Cir. 1998), the Second Circuit found the bus ad space was a designated public

6   forum because the Metropolitan Transportation Authority ("MTA") had

7   accepted political advertising, which the Second Circuit found "evidences a

8   general intent to open a space for disclosure."  *See also Lebron v. Washington

9   Metro. Area Transit Auth.*, 749 F.2d 893, 894, 896 (D.C. Cir. 1984) (finding ad

10  space was a public forum because government had accepted political ads in the

11  past); *United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit

12  Auth.*, 163 F.3d 341, 355 (6th Cir. 1998) (finding government designated its ad

13  space as a public forum because it "accept[ed] a wide array of political and

14  public-issue speech").  But PETA does not assert Metro has accepted political

15  ads in the past.  In contrast, the Second Circuit noted that "[d]isallowing

16  political speech, and allowing commercial speech only," as Metro's policy does

17  here "indicates that making money is the main goal."  *Id.*  Moreover neither

18  *New York Magazine*, *Lebron*, or *United Food* involved the same facts present

19  here, which involve an inconsistent application of an ad policy and instances of

20  allowing some, but not all, advertisements that violate the policy.

21          In *Christ's Bride Ministries, Inc. v. Se. Pennsylvania Transp. Auth.*,

22  148 F.3d 242, 252 (3d Cir. 1998), the Third Circuit found that the government

23  created a designated public forum based on its written policy which only

24  prohibited ads in a few areas (alcohol, tobacco, and ads deemed libelous or

25  obscene), its goal of generating revenue through ad space, and its practice of

26  "permitting virtually unlimited access to the forum."  But Metro's policy here is

27  more robust and restricts an entire category of noncommercial ads, subject to

28  two exceptions.  Moreover, although Metro has permitted some ads that violate

its policy, the evidence does not demonstrate Metro has permitted "virtually unlimited access to the forum."

Notwithstanding the instances in which Metro has permitted noncommercial ads that violate its policy, whether mistakenly or not, Metro's policy against noncommercial ads and its application thereof demonstrate that Metro does require speakers to obtain permission before allowing ads on its buses. The undisputed record does not demonstrate that Metro has a practice of granting permission "as a matter of course to all who seek it." Thus, the second factor weighs in favor of finding a limited public forum.

Under the third *SeaMAC* factor, the nature of the government property, "use of the property as part of a commercial enterprise is generally incompatible with granting the public unfettered access for expressive activities." *SeaMAC*, 781 F.3d at 498 (citing *Cornelius*, 473 U.S. at 804). Here, like in *SeaMAC*, "[t]he principal purpose of the bus advertising program is to generate revenue for the bus system," and the Court is therefore "reluctant to infer that [Metro] intended to open the sides of Metro buses to all comers absent clear indications of such an intent." *Id.* And PETA does not demonstrate any clear indication of Metro's intent to open the sides of all Metro buses to all comers. Thus, all three *SeaMAC* factors weigh in favor of finding Metro's bus ad space qualifies as a limited public forum.

### D. Whether Metro's Policy Violates the First Amendment

PETA claims that both Metro's Exception 2 and general prohibition on noncommercial ads are unconstitutional. In a limited public forum, such as Metro's bus ad space, a government regulation on speech is permitted as long as it is reasonable and viewpoint neutral. *AFDI I*, 904 F.3d at 1132.

#### 1. *Metro's Exception 2*

PETA claims Exception 2 is both unreasonable and viewpoint discriminatory. The Court agrees.

-11-

### a.   **Unreasonableness**

Metro's Exception 2 is unconstitutional because it is unreasonable.  The Ninth Circuit employs a three-part test to determine whether a ban on speech in a limited public forum is reasonable: (1) "whether [the policy] standard is reasonable 'in light of the purpose served by the forum' "; (2) whether "the standard [is] 'sufficiently definite and objective to prevent arbitrary or discriminatory enforcement by [the government] officials' "; (3) and "whether an independent review of the record supports [the agency]'s conclusion" that the ad is prohibited by the agency's policy.  *Amalgamated Transit Union Loc. 1015 v. Spokane Transit Auth.*, 929 F.3d 643, 651 (9th Cir. 2019).

PETA disputes only the first reasonableness factor and argues Exception 2 does not advance Metro's interests behind its prohibition on noncommercial advertising.  According to PETA, there is no reasonable basis to prohibit noncommercial messages that lack government endorsement because the propriety of the message then hinges upon not whether the message aligns with Metro's stated goals, but merely whether a government agency endorses the message for any reason.

Metro has identified six reasons for establishing and maintaining its advertising policy: (1) "to formalize the practices and increase the efficiency of the procedures related to acceptance of advertising to produce revenues for Metro." (2) "to clarify the use of advertising space for the placement of Metro's own advertising to promote transit-related objectives in a variety of forms and locations throughout the Metro System." (3) "to protect Metro from potential litigation." (4) "to protect Metro…from the potential association of advertising images with Metro services." (5) "in order to maintain Metro's neutrality on issues of public debate." (6) "to avoid negative impacts on ridership patronage or commercial advertising and corresponding revenues, while at the same time respecting First Amendment principles." [SUF ¶¶ 20–26].  Moreover, Metro

1  claims the reason for the adoption of Exception 2 was "to allow paid advertising

2  from a nonprofit organization and increase revenues from noncommercial

3  advertising, while continuing to limit the permitted subject matter to a

4  governmental purpose and keeping the policy viewpoint neutral." [Dkt. 48 at

5  16–17].

6       But even in light of Metro's stated interests, Exception 2 is unreasonable.

7  For example, Metro states that it has approved the content of PETA's ads but is

8  merely requiring PETA to comply with Exception 2 and find government

9  endorsement for its messages. [Dkt. 48 at 6]. Thus, according to Metro's own

10  statements, Metro ostensibly has no issue with the content or viewpoint of

11  PETA's ad, and the only reason Metro is refusing to allow PETA's messages is

12  because PETA lacks government endorsement. Such arbitrary reasoning does

13  not align with any of Metro's purported interests in prohibiting noncommercial

14  speech or the enacting Exception 2. For example, if, as Metro claims, the

15  content of PETA's ads are acceptable, it is unclear as to how or why Metro

16  believes that by requiring PETA to comply with Exception 2, a government

17  endorsement will act as somewhat of a talisman and transform PETA's ads from

18  unacceptable to acceptable. Such an arbitrary restriction on otherwise

19  acceptable ads is unreasonable and thus unconstitutional.

20                  **b.**   **<u>Viewpoint Discrimination</u>**

21       As a separate basis for challenging the constitutionality of Exception 2,

22  PETA argues that it is viewpoint discriminatory because it censors

23  noncommercial messages that the government does not endorse. "A regulation

24  engages in viewpoint discrimination when it regulates speech based on the

25  specific motivating ideology or perspective of the speaker." *Interpipe*

26  *Contracting, Inc. v. Becerra*, 898 F.3d 879, 899 (9th Cir. 2018) (citation

27  omitted).

28

Metro argues that its policy is not viewpoint discriminatory because it does not draw distinctions between groups based on their message or perspective and is thus "textbook viewpoint neutral." [Dkt. 48 at 22 (citing *Christian Legal Soc. Chapter of the University of California, Hastings College of the Law v. Martinez*, 561 U.S. 661, 694–95 (2010))]. In *Martinez*, the Supreme Court found that a public law school's policy—conditioning official recognition of a student group on the organization's agreement to open eligibility for membership and leadership to all students—was viewpoint neutral. The Court found that the school's policy drew no distinction between groups based on their message or perspective and was thus "textbook viewpoint neutral." *Id.* at 694–95. Metro argues Exception 2 is similarly viewpoint neutral. It is not.

Pursuant to Exception 2, Metro's policy requires noncommercial ads to first be endorsed by a government agency as a prerequisite to approval. Metro's policy is similar to the unconstitutional policy the Supreme Court struck down in *Saia v. People of State of New York*, 334 U.S. 558, 559 (1948), which allowed the use of loud-speakers only if approved and permitted by the Chief of Police. The Court found the ordinance was unreasonable because it placed the right to be heard within the "uncontrolled discretion of the Chief of Police." *Id.* at 560–61. The Court further noted that the ordinance did not include any standards prescribed for the exercise of Chief of Police's discretion. *Id.* at 560. Metro's policy similarly prohibits noncommercial speech except in instances where the government allows it, without any standards or guidance as to why or when a government agency should approve a noncommercial advertisement. That Metro itself, like the Chief of Police in *Saia*, has the ability to approve noncommercial ads under Exception 2 further demonstrates the prohibition's capriciousness and unreasonableness.

Although Metro claims it "approved the content of PETA's advertisements" [Dkt. 48 at 22] and "merely requested PETA to comply with the advertising policy requirements related to public agency co-sponsorship," [Dkt. 48 at 6], such a requirement is obvious pretext for viewpoint discrimination. In stark contrast to the regulation in *Martinez*, which required all student groups to accept all interested students, Metro's policy does not accept all ads submitted by all noncommercial speakers. Instead, Metro accepts only noncommercial ads that are first endorsed by the government. Such a policy of censorship is the opposite of "textbook viewpoint neutral"—it is textbook viewpoint discriminatory and thus unconstitutional.

### 2. *Metro's General Policy Against Noncommercial Ads*

PETA further argues that even without Exception 2, Metro's general ban on noncommercial ads violates the First Amendment because is it viewpoint discriminatory and incapable of reasoned application.

### a. <u>Facial Viewpoint Discrimination</u>

PETA claims Metro's policy is facially viewpoint discriminatory. An ordinance is facially unconstitutional if "it is unconstitutional in every conceivable application, or [ ] it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally overbroad." *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998), *as amended on denial of reh'g* (July 29, 1998) (citing *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984)). "A regulation engages in viewpoint discrimination when it regulates speech based on the specific motivating ideology or perspective of the speaker." *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 899 (9th Cir. 2018).

Metro's ban on commercial ads is not facially viewpoint discriminatory. PETA argues that Metro's policy allows ads encouraging the purchase of a product but bans ads that discourage the purchase of the same product and is

thus viewpoint discriminatory. But PETA's argument is overly simplistic. For example, under Metro's policy, a speaker would be able to discourage the purchase of a product as long as it was also promoting its own commercial transaction. Thus, the prohibition on noncommercial messages does not turn on a speaker's viewpoint but only whether the message is commercial in nature. "In these circumstances, the managerial decision to limit car card space to innocuous and less controversial commercial and service oriented advertising does not rise to the dignity of a First Amendment violation." *Child. of the Rosary v. City of Phoenix*, 154 F.3d 972, 981 (9th Cir. 1998) (citing *Lehman v. Shaker Heights*, 418 U.S. 298, 304 (1974)). Indeed, both the Ninth Circuit and Supreme Court have upheld prohibitions on noncommercial speech, finding no First Amendment violations therefrom. *See Lehman*, 418 U.S. 298, 304 (1974); *Children of the Rosary*, 154 F.3d 972, 981 (9th Cir. 1998).

### b.   As-Applied Viewpoint Discrimination

PETA also claims Metro's prohibition on noncommercial ads is viewpoint discriminatory as applied to PETA's ads. "An as-applied challenge contends that the law is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others." *Foti*, 146 F.3d at 635.

Even if a restriction is facially neutral, the uneven application of the policy may nevertheless constitute as-applied viewpoint discrimination. In *Cornelius*, 473 U.S. at 812, although a charity drive's policy excluding messages from advocacy groups was facially neutral, the Supreme Court remanded the case because there existed evidence that some groups that should have been excluded by the policy were in fact permitted to participate. Thus, the Court remanded the case for a determination regarding whether the charity drive excluded certain advocacy groups because it disagreed with their viewpoints. *Id.*

Similarly, in *Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*, 653 F.3d 290, 297–98 (3d Cir. 2011), the Third Circuit found that the Port Authority, despite banning noncommercial ads, accepted several comparable noncommercial ads but rejected the challenger's ad.  The Third Circuit held that this evidence strongly suggested viewpoint discrimination.  *Id.*  Further, although the Port Authority argued it simply made a mistake in accepting the comparator ads, the evidence showed the Port Authority accepted the comparator ads with full knowledge of their contents, which the Third Circuit found "amply establishe[d] viewpoint discrimination." *Id.* at 298–99.

Here, the undisputed record demonstrates that Metro improperly permitted several noncommercial ads that did not comply with Exception 2, thus evincing uneven application of its policy and possible viewpoint discrimination as applied to PETA's ads.  For example, Metro rejected PETA's ads and required PETA to comply with Exception 2 because PETA's ads were noncommercial, yet Metro allowed numerous noncommercial ads from non-government organizations without requiring them to comply with Exception 2, such as five ads from The Foundation for a Better Life promoting health care workers, law enforcement, and the virtues of bravery, courage, service, optimism, and unity [SUF ¶ 46], sixty-five ads from the United Way of Greater Los Angeles regarding the social problem of homelessness [SUF ¶¶ 51–52, 54–57, 59–60], an ad from United Teachers Los Angeles containing a pro-teacher message [SUF ¶ 64], and seven ads from Martin Luther King Jr. Center for Nonviolent Social Change promoting "A Movement for Justice" and the website TheKingCenter.org [SUF ¶ 78].  Moreover, Mindiola, Metro's Deputy Executive Officer of Marketing, admitted that permitting several of these advertisements were errors and mistakes by Metro.  [SUF ¶¶ 47, 53, 58, 61, 66,

80].[4]  Although the undisputed record demonstrates Metro's inconsistent application of its policy, there is a triable issue of material fact as to whether this discrepancy constitutes actual viewpoint discrimination or whether these instances were merely honest mistakes by Metro.  Thus, summary judgment based on potential viewpoint discrimination as applied to PETA's ads is inappropriate.  *See* Fed. R. Civ. P. 56(a).

### c.   Unreasonableness of Metro's Noncommercial Ad Ban

PETA argues Metro's application of its ban on noncommercial ads is unreasonable in practice.  Similar to the reasonableness analysis of Exception 2 above, the Ninth Circuit's three-part test for reasonableness applies here as well.  *See Amalgamated Transit Union*, 929 F.3d at 651; *supra* Section III.D.1.a.

The first prong of the reasonableness test, whether the prohibition is reasonable in light of the purpose served by the forum, is easily met.  In *Children of the Rosary*, 154 F.3d at 979, the Ninth Circuit upheld the City of Phoenix's prohibition on noncommercial speech.  The city asserted four interests to justify its limitation on noncommercial speech: "(1) maintaining a position of neutrality on political and religious issues; (2) a fear that buses and passengers could be subject to violence if advertising is not restricted; (3) preventing a reduction in income earned from selling advertising space because commercial advertisers would be dissuaded 'from using the same forum commonly used by those wishing to communicate primarily political or religious messages;' and (4) a concern that allowing [the challenger's]

---

[4]  Metro also approved noncommercial ads from private entities that it claims to have mistaken for county, state, or federal agencies, including six ads from Pacific Gas and Electric Company (PG&E), two ads from People Assisting the Homeless (PATH), and an ad from the Lundquist Institute. PSUF 82–86, 99–104, 113–116.

advertisement would violate the Establishment Clause." *Id.*  The district court found that each of the first three interests were sufficient to support the reasonableness of the city's prohibition,[5] and the Ninth Circuit agreed, finding especially strong the city's interests in protecting revenue and maintaining neutrality on political and religious issues.  *Id.*

Similarly here, Metro asserts six interests to justify the reasonableness of its policy: (1) "to formalize the practices and increase the efficiency of the procedures related to acceptance of advertising to produce revenues for Metro." (2) "to clarify the use of advertising space for the placement of Metro's own advertising to promote transit-related objectives in a variety of forms and locations throughout the Metro System." (3) "to protect Metro from potential litigation." (4) "to protect Metro…from the potential association of advertising images with Metro services." (5) "in order to maintain Metro's neutrality on issues of public debate." (6) "to avoid negative impacts on ridership patronage or commercial advertising and corresponding revenues, while at the same time respecting First Amendment principles." [SUF ¶¶ 20–26].  Like the city's interests in *Children of the Rosary*, Metro's interests sufficiently support the reasonableness of its policy, and especially strong are its interests in maintaining neutrality on issues of public debate and avoiding negative impacts on ridership patronage or commercial advertising revenues.  *See Children of the Rosary*, 154 F.3d at 979.

PETA argues that Metro's interest in avoiding negative impacts on ridership patronage or commercial advertising revenues is belied by the fact that Metro cannot show that it suffered harm from the noncommercial ads that Metro erroneously permitted even though these ads violated Metro's policy.

---

[5] In *Children of the Rosary*, the district court declined to address the Establishment Clause issue.  154 F.3d at 979.

-19-

1   According to PETA, because these violating ads did not cause any harm to

2   Metro, any concern by Metro as to future harm resulting from similar

3   noncommercial ads that violate its ban is speculative and unreasonable.

4        But there are several issues with PETA's argument.  First, PETA

5   inappropriately places the burden on Metro to demonstrate harm, disruption, or

6   interference to its service to justify its stated concern and reason for prohibiting

7   noncommercial speech.  But PETA is the moving party and therefore bears the

8   burden of establishing the purported unreasonableness of Metro's interests.  *See*

9   *Celotex*, 477 U.S. at 323.  It is thus PETA, not Metro, who bears the burden of

10  providing evidence to demonstrate there is no triable issue regarding whether

11  Metro has suffered any harm from the erroneous noncommercial ads that were

12  permitted.  *Id.*  PETA has not met its burden.  Second, even if PETA were able

13  to show that Metro did not suffer harm from the erroneous ads it permitted, that

14  would not necessarily demonstrate that Metro's interest in avoiding negative

15  impact to its service or ad revenues is unreasonable because future harm arising

16  from a future noncommercial ad, such as a provocative or offensive one, would

17  still be reasonably foreseeable.  Third, it is possible that the reason Metro

18  erroneously permitted the noncommercial ads on which PETA relies is because

19  those ads appeared innocuous and did not raise any red flags upon Metro's

20  review.  Thus, it cannot be said that these erroneously permitted ads are a proper

21  weathervane for whether Metro's interest in avoiding harm in the future is

22  unreasonable.

23       However, Metro's ban on noncommercial ads fails the second prong of

24  the reasonableness test, which is whether the prohibition is sufficiently definite

25  and objective to prevent arbitrary or discriminatory enforcement by Metro.  In

26  both *Amalgamated Transit Union* and *Children of the Rosary*, the Ninth Circuit

27  found that prohibitions against noncommercial advertising similar to Metro's

28

-20-

policy here were sufficiently definite and objective. *See Amalgamated Transit Union*, 929 F.3d at 656; *Children of the Rosary*, 154 F.3d at 982.

However, PETA argues that Metro's policy is unreasonably vague because Metro has an unwritten policy of looking beyond the messages of proposed ads and into the speakers' identities, positions, and motivations.  For example, PETA notes that Metro approved ads that do not appear to propose any commercial transaction if, after investigation, Metro determines the speaker engages in commercial activity generally or even has a paying membership structure.  [Dkt. 47-1 at 30 (citing SUF ¶¶ 68–69, 71–75, 105–07, 121–24)].

In *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 201 (4th Cir. 2022), the Fourth Circuit found that the Greater Richmond Transit Company's ban on political ads was unconstitutional because it contained vaguely defined policies and even vaguer unwritten rules that "ma[de] it impossible for a reasonable person to identify what violates their advertising policy and what does not."  *Id.*  Similarly, in *AFDI I*, 978 F.3d at 498, the Sixth Circuit found than an "amorphous ban on 'political' speech" lacked objective, workable standards and was thus incapable of reasoned application.

So too here.  Nowhere in Metro's policy does it state that an organization's commercial identity or activity will impact the determination as to whether the content of the ad is considered commercial or not.  Yet, Metro's officials have admitted, as described below, that Metro has categorized certain ads as "commercial," not because of the content of the ad, but based on the identity of the speaker, which is not a criterion specified in Metro's policy.

For example, Metro deemed commercial an ad by the Black Women for Wellness containing a pro-choice message, encouraging people to visit the website www.stopfclinics.net to learn how to "spot fake clinics" because the organization charged membership dues.  [SUF ¶ 69].  But nowhere in Metro's policy does it state an ad is "commercial" if the proposing organization charges

membership dues.  Moreover, PETA has members that pay to be members and yet Metro did not make any effort to determine if PETA charges its members for membership.  [SUF ¶¶ 146, 148].

Similarly, Metro also deemed commercial an ad from Stanbridge University that read "COVID-19 First Responders, We Thank You," because it found Stanbridge University itself is a "commercial company – or venture." [SUF ¶ 97].  But nowhere in Metro's policy does it state that the content of an ad will be deemed commercial if the proposing entity is a commercial company or venture.[6]  Moreover, PETA sells a variety of products and its gross merchandise sales in fiscal year 2021 totaled $129,381.  [SUF ¶ 147].  But Metro did not make any effort to determine if PETA sells merchandise or is a commercial entity.  [SUF ¶ 189].

Metro also deemed commercial six ads from the Children's Hospital Los Angeles and Kohl's Cares to raise awareness about child safety and injury prevention.  [SUF ¶ 105; Dkt. 47-5 at 84–90].  Metro admitted the six ads were noncommercial but deemed the ad commercial because the ad was "from commercial entities" that were "not nonprofits."  [SUF ¶ 106].  But Metro's noncommercial ad ban does not explain that a speaker's commercial or nonprofit identity will determine whether the content of its ad is commercial. Moreover, the Children's Hospital Los Angeles is a nonprofit organization. [SUF ¶ 107].

Metro also approved a noncommercial ad from the nonprofit AIDS Healthcare Foundation stating, "Syphilis is Serious" and promoting the website freeSTDcheck.org even though the ad did not comply with Exception 2.  [SUF

---

[6] Metro also approved ads from commercial entities that comment on social issues and do not on their face appear to be commercial ads.  Metro approved ads from McDonald's thanking first responders [SUF ¶ 95], and an ad from Jack in the Box about feeding hungry children [SUF ¶ 94].

¶ 72–74].  Mindiola stated Metro approved the noncommercial ads because the AIDS Healthcare Foundation also "offer[s] other services."  [SUF ¶ 74].  But again, nowhere in Metro's ad policy does it state that offering other services is a basis to approve an otherwise noncommercial ad from a nonprofit organization.

Metro also approved two ads from Google encouraging readers to "get the Facts" regarding the COVID vaccine.  [SUF ¶ 76].  Metro deemed commercial Google's ads on the basis that it was a "commercial venture" and involved "brand equity."  [SUF ¶ 77].  But again, Metro's noncommercial ad ban says nothing regarding brand equity as a basis for deeming an ad commercial.

Because of Metro's unwritten rules and seemingly arbitrary application of its policy, Metro's noncommercial ad ban lacks definiteness and objectivity and fails the second prong of the reasonableness test.  Metro's noncommercial ad ban is thus unconstitutional.

Because Metro's ban on noncommercial ads fails the second prong of the reasonableness test, the Court need not go further to analyze the third prong. However, for the sake of completion, the Court notes that the third prong, whether an independent review of the record supports Metro's conclusion that PETA's ad is prohibited by Metro's general prohibition against noncommercial ads and that PETA was required to comply with Exception 2, is satisfied.  In analyzing the third prong, the Court considers the application of Metro's policy as written as opposed to incorporating Metro's unwritten rules and seemingly arbitrary application as discussed in prong two.

PETA argues that its ads should be deemed commercial because PETA is an entity that engages in interstate commercial activity.  In so arguing, PETA relies on *Amalgamated Transit*, wherein the Ninth Circuit found that the Spokane Transit Authority ("STA") improperly excluded an advertisement by the Amalgamated Transit Union ("ATU") as noncommercial.  929 F.3d at 657.

The STA's policy permitted not only commercial ads promoting commercial transactions, but also ads that "more generally promote[] an entity that engages in such activity." *Id.* at 656. Because the ATU engaged in interstate commerce, the Court found its ad "promote[d] an organization that engages in commercial activity" and thus was improperly rejected by STA. *Id.* at 656–57.

But PETA's argument is misplaced because unlike the policy in *Amalgamated Transit*, Metro's policy does not permit noncommercial ads for the reason that they promote an organization that engages in commercial activity. Metro's policy only considers whether an organization is governmental and whether the ad promotes a "sale, lease or other form of financial benefit," not whether it promotes an organization that engages in commercial activity. Whether PETA engages in interstate commerce is inapposite as far as Metro's policy is concerned, and thus, it cannot be said that Metro unreasonably applied its policy to PETA's ads on this basis.

Because Metro's general prohibition on noncommercial ads fails prong two of the Ninth Circuit's reasonableness test, it is unconstitutional. *See Amalgamated Transit Union*, 929 F.3d at 651.

## IV.   CONCLUSION

For the foregoing reasons, the Court **ORDERS**[7] as follows:

1. PETA has standing to pursue its claims.

2. PETA's claims are ripe for determination.

3. Metro's ad space is a limited public forum.

---

[7] Metro filed evidentiary objections in response to PETA's reliance on Deposition Testimony of Bernadette Mindiola [Dkt. 50-1 at 8–9], but none are dispositive to the Court's ruling, and the Court therefore declines to rule on them.

4.  The Court **OVERRULES** Defendants' Objections to the Declaration of Matthew Strugar and/or Material Noted Therein [Dkt. 50-1 at 2–8].

5.  The Court **GRANTS** summary judgment in favor of PETA, finding Metro's Exception 2 is unconstitutional.

**6.**  The Court **GRANTS** summary judgment in favor of PETA, finding Metro's general prohibition on noncommercial advertisements is unconstitutional.

7.  The Court **DIRECTS** PETA to prepare and lodge a Judgment consistent with this Order by December 23, 2022.

**IT IS SO ORDERED.**

Dated: December 19, 2022

SUNSHINE S. SYKES
United States District Judge